DISTRICT OF COLUMBIA vs. J. H. & E. K. JOHNSON.

LAW. No. 19,485.

{ Decided March 3, 1884.
{ The CHIEF JUSTICE and Justices Cox and JAMES sitting.

1. A corporate seal is not necessary to the validity of the contract of a municipal corporation.

2. By an act of Congress (May 15, 1820), the corporation of Washington was given express power to "erect, repair and regulate public wharves, * * * and to regulate the manner of erecting, and the rates of wharfage at private wharves." Under this power, instead of appropriating money to be expended in the construction of a wharf, the corporation contracted with the defendants, that if the latter would erect a wharf at their own expense, and deliver it up at the end of ten years, the corporation would allow them the use of the wharf for ten years, upon the further consideration of the annual payment of a thousand dollars, reserving the right on the part of the corporation to take possession of the wharf upon paying the cost, or a proportional part of the cost, with reference to the time of occupancy by the defendants.

*Held*, A legitimate exercise of the power to *erect* wharves.

3. The chief engineer of the army has no power to issue a license to erect wharves in the District of Columbia; whatever power the commissioners of the Federal city, to some of whose powers he succeeded, may have had in that respect, expired when Congress assumed legislative jurisdiction over the District.

4. In an action to recover rent of a wharf, plaintiff, the District of Columbia, offered, without objection or subsequent contradiction on the part of the defendants, evidence showing that defendants had admitted holding the premises in question under a lease from the District, and had paid the District rent therefor under said lease.

*Held*, That the court was warranted in assuming that the defendants held the property under this lease.

5. Where a party enters into possession under a lease, he is estopped from questioning the right of his lessor.

6. It is error to leave to the jury the question whether anything of value was given to or conferred upon defendants by plaintiffs for payment of which suit is brought, as that leaves to the jury a question of law, *i. e., value* in its legal sense.

7. Limitations may be pleaded to a parol contract to pay rent, when the contract consists of an ordinance of a municipal corporation, for leasing, assented to by the proposed lessee.

THE CASE is stated in the opinion.

RIDDLE & MILLER for plaintiff.

HINE and BIRNEY for defendants.

Mr. Justice Cox delivered the opinion of the court.

This action was brought to recover rent alleged to be due from the defendants, as tenants, under a lease heretofore executed to them by the corporation of Washington. The circumstances of the letting, as the evidence on the part of the plaintiff tended to show, were as follows:

On the 7th of December, 1867, the corporation of Washington passed an act in the following terms, in part, to wit:

"That permission be and hereby is granted to J. H. Johnson and E. K. Johnson to construct at their own expense, and without any cost to the corporation, by reason of any expenditure or liability that may be incurred by them on account thereof, a wharf on the Potomac, at a point to be selected between 12th street west and 13th street west, and to erect thereon such buildings as may be necessary for the work and storage that may be required by the fishing business."

Then follows a proviso which it is unnecessary to recite.

Section 2d of said act is as follows :

"That in consideration of the making of the wharf and erection of the buildings above contemplated and provided for, and as a full remuneration for the labor and expenses thereby incurred, and for the further consideration of the payment to this corporation of an annual rent of one thousand dollars, the same to be paid quarter-yearly, in sums of two hundred and fifty dollars each, the said J. H. and E. K. Johnson, their heirs and assignees, shall have the full and entire use of the said wharf and its appurtenances, from the time of its completion until the expiration of ten years from the date of the passage of this act."

Then another proviso.

Section 3. "That at the expiration of a period of ten years immediately following the passage of this act, or at any previous time, when the occupant or occupants of the said wharf shall refuse or neglect to keep it in good order or repair, or to comply with the police laws of this corporation, the privilege of occupying or using the said wharf, the prop-

erty to which it is attached, or any of the appurtenances of the said wharf, as conferred in the second section of this act, shall immediately cease and terminate, and the entire property, of which the conditional use and enjoyment is thereby granted, together with the wharf hereby authorized, and all improvements thereon or connected therewith, shall revert to and become the property of this corporation, free from any charge or claim whatsoever on the part of the said J. H. and E. K. Johnson, their heirs or assignees, for or in consideration of the erection of the wharf, or of any rent paid therefor, or of any improvements therein or connected therewith, which they shall have made while enjoying its use and occupancy under the provisions of this act."

The act further provided: "That if the corporation shall, before the expiration of the aforesaid ten years, wish to take into its possession, for public use, the said wharf and appurtenances it shall have the right to do so by paying to the said J. H. and E. K. Johnson, their heirs and assignees, a proportional part of the money expended by them in constructing and improving the said wharf, in proportion to the length of time their occupancy may bear to the whole amount."

An additional section (4) enacts: "That this act shall not take effect until the said J. H. and E. K. Johnson shall have entered into an obligation with the mayor, binding themselves and their heirs and assignees, in the sum of six thousand dollars, to a faithful fulfilment of all the requirements of this act, and that at the end of the term herein named, they will relinquish and convey to this corporation the said wharf and all its appurtenances, free of any cost or charge therefor or on account thereof."

On the 22d of January, 1868, the corporation passed an additional ordinance providing:

"That so soon as the wharf authorized to be erected on the Potomac river, between 12th and 13th streets west, as per act of December 7th, 1867, shall have been completed, and such buildings erected thereon as may be necessary for the work and storage required by the fishing business, the

said wharf shall be, and is hereby established as a fish wharf and dock, and may be used as such by the proprietors thereof, or their assignees, so long as they shall continue to occupy said wharf under, and comply with, the terms and conditions of the above-mentioned act."

On the 7th day of February following, the defendants, together with Charles B. Church, as security, executed the bond required by the fourth section of the act, which referred to the act, and contained a condition that they "shall faithfully, diligently and honestly execute, perform and fullfil all and singular the requirements of an act passed and approved December the 7th, 1867."

The evidence further tended to prove that the defendants went into, or continued in, possession of the wharf under these acts of the corporation of Washington, and paid rent for a period of one year and three-quarters, amounting to seventeen hundred and fifty dollars, and after that date they refused to pay more rent, and this suit is brought to recover the rent that accrued from the date at which they ceased paying, to the date of this suit.

At the trial, the plaintiff objected to the admission of various matters of evidence offered on the part of the defense, and their exceptions to the admission of that evidence come here upon a motion for a new trial, and we proceed to examine the defenses set up in the case.

It may be proper to notice a preliminary position that was taken in the argument here by the counsel for the defendants. It is said that, upon the very face of the record, it will be observed, that the contract relied upon by the plaintiff is void, and that it is useless to send the case back for a new trial. It is undoubtedly true, that the court will not reverse a judgment below and order a new trial upon the ground of instructions adverse to the plaintiff, if it can be seen from the record that the plaintiff has no case and cannot make one if he has a new trial. How is it in the present case? It is urged here that the so-called lease is void, because it is not a lease under the seal of the corporation, and several authorities have been cited in support of that position.

We had supposed that the doctrine that a corporation, either municipal or private, could not make a lease or other contract by parol, or otherwise than under their corporate seal, had been long since exploded, but in deference to the counsel who asserts this position, we have examined the authorities submitted by him.    The first is the case of Kinzie vs. Chicago, 2 Scam., 187.    It seems, in this case, that the corporation of Chicago had the title of "The Trustees of the Town of Chicago," and that these trustees executed a lease which purported to be interchangeably executed under the seals of the parties thereto; the lessee, in fact, signed his name with a seal; the trustees signed their individual names without any seal at all; at least, without any corporate seal; and the court simply held that that was not the deed of the corporation.    That case does not affect the general question at all, of the capacity of a municipal corporation to lease otherwise than by deed.

In the case of Doe, &c., against Thomas Duncan, 1st Jones, North Carolina Reports, 239, it was simply held, that, in an ejectment suit, the mere ordinance of a town, not under the seal of the corporation, not expressing a consideration, not delivered to parties claiming title thereunder, did not amount to a conveyance of a legal title, so as to make out the chain of title which the plaintiff must establish in an ejectment suit.

The cases of William H. Copp vs. John Neal, 7th New Hampshire, 275, and Cofran vs. Cockman, 5th New Hampshire, 458, are simply against the position for which they are cited.

The former case holds that a vote of the town is evidence of title without a deed.    The case in 5th New Hampshire holds that lands belonging to a town may be conveyed by deed in the name of an authorized agent, though, generally, the deed must be in the name of the principal.    So that none of these authorities support the position for which they have been cited, viz., that a lease is invalid because it is not under the seal of the corporation.

It was also suggested that the corporation had no right

to lease the wharf at all, but only to regulate the sale of fish. It is unnecessary to discuss this question, because the license in this case was substantially an exercise of an express power given to the corporation of Washington *to erect wharves.* Instead of appropriating public money to be expended in the construction of a wharf, they contracted with the defendants that if the latter would erect a wharf at their own expense, and deliver it up at the end of ten years, the corporation would allow them the use of the wharf for ten years, upon the further consideration of the annual payment of a thousand dollars, reserving the right, on the part of the corporation, to take possession of the wharf upon paying the cost, or a proportional part of the cost, which the defendants incurred in constructing said wharf, considered with reference to the time of occupancy. This seems to us a very economical, wise and legitimate exercise of the power conferred upon the corporation, *to erect wharves.*

Passing, now, from this preliminary consideration, we proceed to consider the defence in this case. The principal, if not the only defence, is, that the defendants claim title from another source of authority than the corporation of Washington; that is, they claim to hold under a license from the commander of the engineer corps of the army. The substance of the testimony is, that at and before the time when these acts were passed by the corporation of Washington, one John Pettibone was in possession of the property, which has been decided by us and the Supreme Court of the United States to be *public* property, as a squatter, not having any rights at all; that he had brought a quantity of lumber there with a view of erecting a wharf, and had made application to the chief of the engineer corps for a license to construct a wharf there; and that Charles B. Church, and one of the defendants, bought out his rights, whatever they were; that is, bought out his lumber and his possession, and, in anticipation, the rights that he was to acquire under this license that he had only applied for and not received, having also his agreement that when he received the license he was to assign it to them; and that,

in point of fact, on the 18th day of January, 1868, which was after the first ordinance was passed, but before the second was passed, and also before the bond was executed (before which execution the first ordinance was not to go into effect at all), the license was issued by General Humphreys to John Pettibone; and in pursuance of the agreement between him, Pettibone, on the one hand, and Church and Johnson on the other, it was formally assigned to them about three years and a half afterwards, and put on record; and they claim that this license gave them title to erect a wharf there, and that they are under no obligation to recognize the rights of the corporation of Washington, although they took a lease from it.

The claim of the defendants is, that the power to issue this license was conferred by the act of the Assembly of Maryland of December 19th, 1791, upon the commissioners of the Federal city, and that by successive acts of legislation, it has been transmitted to the commander of the engineer corps of the army.

By act of Congress of July 16, 1790, which is entitled, "An act for establishing the temporary and permanent seat of the Government of the United States," the President of the United States was authorized to appoint three commissioners, with full powers:

First, to survey, define and limit a district for the seat of the Federal Government.

Second, to accept such land as the President may deem proper for the use of the United States.

Third, to provide suitable buildings for the accommodation of Congress, the President, and the public offices.

In June, 1791, after the Federal city had been selected and bounded, the proprietors of the land lying within the limits of the city conveyed all their land, or nearly all, to certain trustees, well known as Beall and Gantt, upon certain trusts in the deeds mentioned. One of the trusts was that *these commissioners* should lay out the city into squares, lots and streets, and make a division of these lots between the proprietor and the Government of the United States, and

that the lots so assigned to the United States, in this distribution, and the streets and avenues, should be conveyed by these trustees to the Federal commissioners, and then a further trust was, that these commissioners should sell the lots from time to time, as the President should direct.

There were certain powers given to the Federal commissioners by the deeds from the original proprietors, in addition to the powers that were vested in them by the act of July, 1790. The act of 1791, of the State of Maryland, also gave certain powers to these commissioners. One of these was, that where minors, married women, persons *non compos mentis* and non-residents, were interested in lands, these commissioners should make an allotment of them between the proprietors and the United States. The act, by its own force, vested the title of these lands in the trustees named in the deed of trust that I have already mentioned. Another was, that they might institute proceedings to condemn land of the original proprietors who were *sui juris*, and who failed to convey. Thirdly, they had power to keep a record of all allotments and sales of land in the city of Washington; and, fourthly, to take acknowledgments of deeds of lands in the District of Columbia.

Now, it will be observed, that some of these powers were of a permanent character, or of indefinite duration. They were to last just as long as it was necessary to provide buildings for the accommodation of Congress and the public offices, to make allotments between the original proprietors and the Government, to make sales of lots belonging to the United States, according to the trusts in the deeds from the proprietors, and to keep a record of all allotments and sales of land, and take acknowledgments of deeds.

Some of the powers conferred by the act of Maryland were of a purely temporary and provisional character, and among them the power which has been invoked in this case.

Section 12 of the act of December 19, 1791, provides:

"That the commissioners aforesaid, for the time being, or any two of them, shall, from time to time, *until Congress shall exercise the jurisdiction and government within said ter-*

*ritory,* have power to license the building of wharves in the waters of the Potomac and Eastern Branch, adjoining said city, of the materials, in the manner and of the extent they may judge durable, convenient, and agreeing with general order; but no license shall be granted to one to build a wharf before the land of another, nor shall any wharf be built in said waters without license as aforesaid; and if any wharf shall be built without such license, or different therefrom, the same is hereby declared a common nuisance."

In passing, it may be observed that this seems to be nothing more than the power to issue licenses to private persons to build wharves on their own property, upon certain conditions imposed by the commissioners. This is precisely like a license to a man to construct a building on his own land according to certain building regulations, or to prosecute a certain trade. The act expressly excludes the right of building a wharf in front of another man's property, and it can hardly apply to wharves constructed in front of public property. Passing from that, we may observe, that this power was of a temporary character, just like a number of other powers in the same section, among which was the power to license the sale of spirituous liquors in the District. It was a power to license, &c., "until Congress shall exercise jurisdiction and government within said territory."

On the 16th of July, 1790, Congress passed a law declaring that the seat of government shall be transferred to the District of Columbia, on the first Monday of December, 1800; and on the 27th of February, 1801, Congress completely assumed jurisdiction, by an "Act concerning the District of Columbia," which established the legal system of the District, by declaring that the laws of the State of Maryland and the State of Virginia, then in force, should be respectively the laws of the county of Washington and the county of Alexandria, in the District of Columbia, and further proceeded to establish a judicial system for the District of Columbia, and put in operation the whole machinery of the government here; so that, by that act, Congress completely assumed to exercise jurisdiction and government

within the territory described in the act of Maryland of 1791. The passage of this law, then, was the limit, in point of duration, of the temporary powers that I have already spoken of, which included the power to license the erection of wharves in the waters of the Potomac and Eastern Branch. There were yet certain powers vested in these commissioners of the character that I have elsewhere described as indefinite in their duration and permanent in their character; such as the power still to make a division of the lots and squares between individuals and the Government, the power to make sales of government lots, and to keep a record of sales, and to take acknowledgment of deeds, and some of these powers have been exercised by the successors of the board of commissioners to a very late date.

On the first of May, 1802, Congress passed an act entitled "An act to abolish the board of commissioners in the city of Washington, and for other purposes." By the first section the board was abolished, and by the second, "The affairs of the city which have heretofore been under the care and supervision of said commissioners shall hereafter be under the direction of a superintendent to be appointed by the President who is invested with all powers and shall perform all duties which the said commissioners are *now vested with or are required to perform*, by, or in virtue of, any act of Congress or any act of the general assembly of Maryland, or any deed of trust from the original proprietors of the lots in said city." The act, therefore, it will be seen, transferred to the superintendent all the powers that were vested, *at that time,* in the board of federal commissioners (the commissioners of the federal city, as they were called). Then, on the 29th of April, 1816, another act abolished the office of superintendent, and transferred his duties to the commissioner of public buildings provided for by said act. Then, by the act of March 2, 1867, it was provided, "That the office of commissioner of public buildings is hereby abolished, and the chief engineer of the army shall perform all the duties now required by law of said commissioner, and shall also have superintendence of the Washington aqueduct and

all the public works and improvements of the Government of the United States in the District of Columbia, unless otherwise provided by law."

It is by virtue of these several acts, that the defendant supposed the power to have become vested in the chief engineer of the army, to issue this license; but if the view that we take of this legislation is correct, that power, which was in the commissioners of the federal city, expired at the date when Congress assumed legislative jurisdiction over this District, and, therefore, it was not transmitted to the chief engineer of the army.

But even if it can be supposed that the power was not abolished, but that it passed in the general devolution of the powers conferred upon the commissioners of the federal city through the superintendent and commissioner of public buildings, to the chief engineer of the army, still it would take effect in subordination to any special legislation of Congress on this subject. Now, we find that Congress, as far back as 1812, passed an act entitled "An act further to amend the Charter of the City of Washington," in which they declared that taxes authorized by the act should "be expended in each ward" upon certain objects among which was "erecting and repairing wharves." But, later on, and on the 15th of May, 1820, they passed an act entitled, "An act to incorporate the inhabitants of the city of Washington and to repeal all acts heretofore passed for that purpose," and in that they conferred upon the city of Washington power "to preserve the navigation of the Potomac and Anacostia rivers, adjoining the city, to *erect, repair* and *regulate public wharves* and to deepen creeks, docks and basins; to regulate the manner of erecting and the rates of wharfage at private wharves." We suppose this power to erect public wharves is a power to erect them upon public property, and not upon private property. This act, therefore, confers upon the city of Washington the plenary power to erect and repair public wharves. Under that, it is clear that the city of Washington had the right to license the building of the wharf which is the subject of controversy in

this suit. The power, then, claimed to be in the commissioner of public buildings or the chief engineer of the army, his successor, to issue licenses for the building of wharves, would be inconsistent with the power given to the city. And, therefore, even if the power was conferred on the original commissioners, the act incorporating the city transferred it to the authorities of the city of Washington. Therefore, in our judgment, the engineer of the army never had the slightest power in the world to license the erection of wharves on the Potomac and Eastern Branch, and, for that reason, we think it was error in the court below to admit this license, at all, in evidence. It purports to be a license from the chief engineer of the army of the United States "by virtue of the power vested in him by the act of the assembly of Maryland, passed December the 19th, 1791, to license 'the building of wharves in the city of Washington, in the District of Columbia, and to regulate the material, the manner and extent thereof,' and the several acts of the Congress of the United States, subsequently passed and approved, substituting the said chief of engineers in the place and stead of the commissioners in said act of assembly mentioned." This was offered in evidence, together with the assignment executed by John Pettibone to these defendants. These documents were admitted against the objection of the counsel for the plaintiff, and we think that there was error in admitting them in evidence at all, and furthermore, that there was error in the instruction given by the court on this subject, in the following terms:

"If the jury find from the evidence that on the seventh day of December, 1867, Mr. Pettibone was in possession of the premises for which rent is now claimed by the plaintiff, and his possession was not under the late corporation, known as the mayor, board of aldermen, and board of common council of the city of Washington, but was under the United States, and that the said corporation or the plaintiff did not at any time since the date aforesaid obtain possession thereof, then the plaintiff is not entitled to recover."

This instruction is clearly erroneous. The instruction

was, that if possession was under the United States Government, the jury should find for the defendants; the evidence offered to establish that possession under the United States Government was wholly inadmissible.

But, independently of that exception, there is another objection to that instruction.    Even if it be true that Pettibone had squatted down upon this *public* property, as we have decided it to be, before this act of the corporation of Washington was passed, and even if the defendants could be said to hold under a license from the United States, it is also perfectly plain, from the record, that they in like manner held, at the same time, under this lease from the corporation of Washington.    There was offered in evidence at the trial, by the plaintiff, a bill in equity, which had been filed by these defendants against third parties, to prevent them from interfering with the defendants in this suit (with the rights claimed by them under the ordinance of the corporation of Washington), in which they say, after reciting these ordinances of the corporation of Washington, and also the license from the chief engineer of the army of the United States "that in pursuance with the authority *so conferred* upon your orators *by the ordinances* and grant aforesaid, and also such other right and authority as the general ordinances of said city give to responsible persons to build private wharves on the said river front, your orators proceeded to erect, and have erected, a large wharf at the locality aforesaid, and in so doing have laid out and expended a large amount of money," &c.    That bill is signed by one of these defendants, and sworn to, and the same defendant, in his deposition, states, "the grant I have is for ten years, and I pay the corporation $10,000, and the superintendent $1,500 per year; and if I fail to comply with my part, I forfeit the wharf and all its appurtenances and my bond, with security for $6,000."    There was also offered in evidence a letter from the defendants, through their attorney, addressed to the attorney of the corporation, with reference to this very claim of rent, in which they complain of not having derived certain advantages from their lease, and wind up

by appealing simply for an equitable consideration of the case, and say, "*the Johnsons do not contest the right of the District government in the premises, but only ask that any claim or demand it may have against them be equitably adjusted.*" This evidence was put in without any objection, and there is not one word of evidence in contradiction of it, and the court is therefore warranted in assuming the fact to be true that these parties held this property under this lease, from the corporation of Washington. They have recognized the rights of the corporation of Washington, by taking and holding a lease from them, and by paying rent for the wharf for a year and three-quarters. What difference, then, does it make if they choose to fortify their possession also from some other source of authority? It is not for them to deny their title from the corporation of Washington, and to set up a title from a third party; they are absolutely estopped from so doing. This is an elementary principle of law, which it is useless to discuss. Though there may have been some semblance of authority to give a license in the chief engineer of the army, yet when these parties come in directly under this lease, it is not in their power to question the right of the corporation, their landlord, upon the ground that they have also derived a grant from and occupied these premises through some other authority. For that reason, there is another one of the instructions which were given by the court below which seems to be clearly erroneous. That is in the following terms:

"If the jury find from the evidence that, on the seventh day of February, 1868, the possession of the premises, for which rent is now claimed by the plaintiff, was not in the said late corporation of the city of Washington, or in persons holding under said late corporation, but in Mr. Pettibone and his guarantees, all of whom claim to hold under a license from and by permission of the United States, exclusive of any claim by said corporation, and that the said corporation or the plaintiff did not at any time before the beginning of this suit, obtain possession thereof; then the plaintiff is not entitled to recover." Under this prayer the

jury are told that if the defendants *claim* to hold under the United States, then they must render a verdict for the defendant. We think that this is clearly erroneous. There are two or three instructions which are of the same family. Here is another one:

"Unless the jury find from the evidence that the defendants were let into possession of the land by the plaintiff, or the late corporation of the city of Washington, the plaintiff is not entitled to recover." This, in view of what we have already stated and referred to, ought not to have been given. Again, "If the jury find from the evidence, that the plaintiff has neither given to nor conferred upon the defendants anything of value for what it has brought this action against them to recover, then it is not entitled to recover." Besides other objections, there is one fatal one to this, viz., that it leaves the jury to determine a question of law, that is, whether any value, *in a legal sense*, was derived by defendants from the execution of this lease by the corporation of Washington. There are two other instructions relating to the bond which was executed by the defendants to the plaintiff, asserting substantially that if the bond was executed under a mistake of fact or on misrepresentation, the jury should find the bond void. We hardly see the pertinency of these instructions, because the suit is not brought upon the bond, and, besides, there was no evidence introduced as a foundation for them.

At the trial an instruction was asked upon the part of the plaintiffs to this effect: "The court is requested to instruct the jury that, as the suit is brought upon the ordinance of the corporation of Washington city, the limitations pleaded by the defendants is not a bar." This proceeds upon the idea that the suit is brought upon a statutory liability. We do not take that view of it, however. It seems to us that the liability does not arise by force of the ordinance or statute, but that the ordinance is simply a proposition upon the part of the city, accepted by the defendants, and it is the acceptance of the defendants which constitutes their agreement, and the suit is brought upon that agreement. That agreement is

simply a parol one, although it is fortified by a collateral bond under seal. We think that this suit is affected by the plea of limitations.

For the reasons given before, we think the verdict must be set aside and a new trial given.